**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SENTORYIA YOUNG,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:12-cv-00304** |
| | ) | **Judge Trauger** |
| **RONALD COLSON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Petitioner Sentoryia Young, a state prisoner serving a sentence of life without the possibility of parole for second degree murder as a repeat violent offender, has filed a *pro se* petition and amended petition under 28 U.S.C. § 2254 for the writ of habeas corpus (ECF Nos. 1, 2), which were followed by the appointment of counsel (ECF No. 15) and counsel's filing of the operative second amended petition (ECF No. 30). The respondent has filed an answer, along with a copy of portions of the state court record (ECF Nos. 33 and 34), and the petitioner has now filed a reply (ECF No. 71) and two supplements accompanied by additional portions of the state court record (ECF Nos. 72, 73).

This matter was stayed from March 12, 2013, until May 30, 2013, pending the United States Supreme Court's decision in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). (ECF Nos. 50, 52.) The court subsequently denied the petitioner's motion for discovery, finding that no good cause existed for the particular discovery sought because the claims related to the proposed discovery were procedurally defaulted despite the impact of *Trevino* and *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014). (ECF No. 66.)

This case is now fully briefed and ripe for review. For the reasons set forth below, the petition for the writ of habeas corpus will be denied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

At the petitioner's first trial in March 2004, a witness alluded to his prior criminal history after the trial court expressly ordered that no such reference was to be made.  The petitioner requested and was granted a mistrial. *Young v. State*, No. M2010-01762-CCA-R3-PC, 2011 WL 3630128, at *1, 4 (Tenn. Ct. Crim. App. Aug. 18, 2011) (Docket Entry No. 34-30).  The petitioner was retried in Davidson County Criminal Court and was convicted on December 14, 2004, of second degree murder and two counts of aggravated assault. (ECF No. 34-1, at 143–44.)  He was sentenced to life in prison without the possibility of parole for the second degree murder conviction, as a result of his status as a repeat violent offender. (ECF No. 34-1, at 157.)  He was also sentenced to six years in prison for each of the aggravated assault convictions, to be served concurrently with the life sentence. (ECF No. 34-1, at 158–59.)  The Tennessee Court of Criminal Appeals affirmed the convictions and sentences on direct appeal, and the Tennessee Supreme Court denied permission to appeal on December 8, 2008. *State v. Young*, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108 (Tenn. Ct. Crim. App. May 12, 2008), *perm. to appeal denied*, (Tenn. Dec. 8, 2008) (Docket Entry No. 34-26).  The record does not reflect that the petitioner sought certiorari from the United States Supreme Court.

While the petitioner's direct appeal was pending in the Tennessee Court of Criminal Appeals, he filed a petition for writ of error coram nobis in the trial court, which was denied following an evidentiary hearing. (ECF No. 34-19, at 5–7, 79–87.)  The Tennessee Court of Criminal Appeals affirmed that judgment in the petitioner's consolidated direct appeal, on which the Tennessee Supreme Court denied review. *State v. Young*, 2008 WL 2026108, at *11–14 (Docket Entry No. 34-26).

The petitioner filed a *pro se* petition for post-conviction relief on January 8, 2009 (ECF No. 34-27, at 22), and filed an amended petition through counsel on June 12, 2009. (ECF No. 34-27, at 40.)   The trial court denied relief on July 8, 2010. (ECF No. 34-27, at 59–64.)   The

Tennessee Court of Criminal Appeals affirmed the denial, and the Tennessee Supreme Court again denied permission to appeal on November 16, 2011. *Young v. State*, No. M2010-01762-CCA-R3-PC, 2011 WL 3630128, at *1, 4 (Tenn. Ct. Crim. App. Aug. 18, 2011) (Docket Entry No. 34-30).

Pursuant to the prison mail-box rule, Petitioner filed his original petition under 28 U.S.C. § 2254 in this court on March 23, 2012. (ECF No. 1-1, at 1.) Respondent does not dispute that this action is timely.

## II. STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals on direct appeal summarized the facts of the case as follows:

> This case arises from an altercation occurring in front of a Comfort Inn hotel room in Hermitage. During the early morning hours of January 23, 2002, the Defendant shot at three men, Torey Pillow, Aaron "Shawn" Pillow, and Wayne Robison. As a result, a Davidson County grand jury indicted the Defendant for second degree murder (Torey Pillow) and two counts of aggravated assault (Shawn Pillow and Wayne Robison). See Tenn. Code Ann. §§ 39-13-102, -210 (defining the offenses of second degree murder and aggravated assault). A jury trial was held in December of 2004.

> Viewing the evidence in the light most favorable to the State, the proof at trial showed that, on the evening of January 22, 2002, Shawn Pillow had rented a hotel room at the Comfort Inn in Hermitage. At some point in the evening, the Defendant and David Clark arrived at the hotel room. The Defendant was driving a silver Pontiac. Torey Pillow, Shawn Pillow's brother, picked up Wayne Robison in his maroon Buick, and they joined the group at a strip club. The Defendant, David Clark, Shawn Pillow, Torey Pillow, Chris Grizzard, and Wayne Robison were all in attendance at the club.

> While at the club, David Clark gave his phone number to one of the strippers. Thereafter, the group left and went to another strip club, but it was closed. While the group was in the parking lot of the second strip club, the woman to whom Clark had given his number telephoned. The group met up with the two women, Chithantkia Fisher and Denita Smith.

> All these individuals then returned to Shawn's hotel room. Torey Pillow dropped off his passengers and left. The women agreed to provide sex to the remaining men for $250.

> Torey returned in the early morning hours to pick up his brother and Robison. Shawn and Robison got in the car with Torey, and they left the hotel. One of the

women had noticed that her money was missing from her pants. Grizzard called the three men inquiring about the missing money. The Pillows and Robison returned to the hotel and began arguing with Grizzard about the missing cash. Grizzard was demanding compensation and accused Robison of "cockin' a strap," or cocking his pistol. In order to show that the gun was not cocked, Robison raised his hands and said "I ain't doin' nothing." The Defendant then approached the passenger's side of the vehicle and began firing. Shawn Pillow and Wayne Robison testified that they saw the Defendant fire first. Shawn then returned fire at the Defendant.

Torey Pillow died as a result of a gunshot wound to the head. Wayne Robison was shot in his thigh, and Shawn Pillow was shot in the stomach.

*State v. Young*, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *1-2 (Tenn. Crim. App. May 12, 2008).


III.     **ISSUES PRESENTED FOR REVIEW**

In his Second Amended Petition, Petitioner asserts the following claims for relief:

1.  The evidence was insufficient to support the conviction.

2.  Trial counsel had a conflict of interest.

3.  Improper presence of extraneous document in jury room violated Petitioner's right to fair trial.

4.  Prosecutor committed misconduct by intimidating a witness.

5.  Trial counsel was ineffective for failing to move to suppress statement made under the influence of alcohol and drugs.

6.  Trial counsel was ineffective at first trial for failing to move for mistrial with prejudice.

7.  Conviction violated the Double Jeopardy Clause.

8.  Trial counsel was ineffective for failing to challenge validity of prior conviction used to enhance Petitioner's sentence.

9.  Trial counsel was ineffective for failing to seek relief based on sleeping jurors.

10.  Trial court erred in failing "to correct the obviously intolerable situation of jurors sleeping through the presentation of evidence."

11.  Trial court erred in admitting chart created by witness at prosecutor's direction.

12.  Prosecutor committed misconduct during closing argument.

13.  Trial counsel was ineffective for failing to impeach witness at coram nobis hearing.

14. Trial court erred in failing to act as thirteenth juror at hearing on motion for new trial.

15. Prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose witness's mental illness to Petitioner before or during trial.

16. Appellate counsel was ineffective for failing to raise claims on appeal.

17. Trial counsel was ineffective for failing to move to strike the jury panel after prejudicial statements by prospective juror.

18. Trial court erred in failing to instruct the jury on lesser included offenses and refusing to instruct that an element of second degree murder is "a knowing killing without adequate provocation."

19. Trial court erred in admitting gruesome and inflammatory photographs of deceased victim's body.

20. [This claim has been affirmatively withdrawn by Petitioner. (ECF No. 71, at 54.)]

21. Prosecutor's discretion to prosecute Petitioner as a Repeat Violent Offender is unconstitutional.

22. Jurors committed misconduct during voir dire by misrepresenting that they could consider self-defense and defense of others as a valid defense to a murder charge.

23. Tennessee's post-conviction review process is constitutionally inadequate in violation of the right to due process.

24. Use of Petitioner's prior conviction to enhance his current sentence violates the prohibition on Ex Post Facto laws.

25. Cumulative effect of errors amounts to constitutional violation.

IV.    **STANDARD OF REVIEW**

A.    **AEDPA Review on the Merits**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious

effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court concludes that the decision is erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner carries the

burden of proof. *Pinholster*, 563 U.S. at 181.

By its express terms, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding, including instances where the state court rules against the petitioner in a summary opinion that rejects all claims without discussion, or an opinion that addresses some claims but does not expressly address all of the federal claims presented. *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013); *Harrington v. Richter*, 562 U.S. at 98–99; *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). Where a claim has not been adjudicated on the merits in state court but is still subject to federal review despite the bars of exhaustion and default, "federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed *de novo*." *Moritz v. Lafler*, 525 F. App'x 277, 282 (6th Cir. 2013) (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)); *accord Bies v. Sheldon*, 775 F.3d 386, 395–96 (6th Cir. 2014) ("Because Bies' *Brady* claim was never 'adjudicated on the merits in State court proceedings,' the limitations imposed by § 2254(d) do not apply, and we review the claim de novo.").

## B. Exhaustion and Procedural Default

### 1. Exhaustion

28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. at 182. The petitioner must "fairly present"[1] each claim at all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).

---

[1] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

Tennessee Supreme Court Rule 39 eliminated the need to seek review in that court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956 (2004); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims ... but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009). For the claim to be exhausted, it must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, federal courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; 3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the

pertinent] constitutional law." *Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Moreover, the claim must be presented to the state courts under the same legal theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). It cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. *Id.* This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. *Wagner*, 581 F.3d at 414.

### 2. *Procedural Default*

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same).[2] If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents

---

[2] "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* at 1128 (quoting *Kindler*, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

circumvention of the exhaustion doctrine).

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Coleman*, 501 U.S. at 753; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488. Second, constitutionally ineffective assistance of counsel may constitute cause under certain circumstances. *Murray*, 477 U.S. at 488–89; *Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).

Until recently, a prisoner could not demonstrate cause by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–53 (holding that attorney error is not cause to excuse a default). That barrier was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted). However, in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court held that the ineffective assistance of post-conviction counsel can establish cause to excuse the procedural default of a defendant's substantial claim of ineffective assistance at trial, but only where state procedural law prohibits defendants from raising such claims on direct appeal and instead requires defendants to raise the claims for the

first time in post-conviction proceedings. *Id.* at 1318– 19. Less than a year later, the Supreme Court issued *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). *Trevino* extended *Martinez* to apply to cases where, although state procedural law might permit defendants to raise ineffective-assistance claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921.

Applying *Trevino*, the Sixth Circuit Court of Appeals has recognized that "Tennessee defendants, too, are highly unlikely to have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014). The court therefore held, based on *Martinez* and *Trevino*, that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Id.* at 795–96.

The *Martinez* Court's creation of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. Thus, *Martinez* requires, in order to establish cause for default, both that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," *see id.* at 1320 ("The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts."), and that the claim be a "substantial one." *See id.* at 1318–19 (noting that the prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to

say that the prisoner must demonstrate that the claim has some merit").

A petitioner seeking to overcome procedural default must establish prejudice as well as cause. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that, "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495–96); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V.     ANALYSIS AND DISCUSSION

### A.     Defaulted Claims

#### 1.     *Claims Never Presented in State Court*

Respondent asserts that Claims 4, 10, 12, 15, 19, 21, 23, 24 and 25 are procedurally defaulted because the petitioner never raised them in state court. The petitioner does not dispute that the claims were never raised, but asserts various causes to excuse the defaults.

With respect to Claims 10 (trial court error – sleeping jurors), 12 (prosecutorial misconduct during closing), 19 (prejudicial photographs)[3], 21 (unconstitutional prosecutorial discretion), 23 (inadequate review process)[4], 24 (ex post facto violation) and 25 (cumulative effect of trial errors)[5], the petitioner argues that the ineffective assistance of counsel on direct appeal in failing to raise those claims establishes cause to excuse their default. (ECF No. 71, at 12–13, 39–41, 42–43, 54, 58–59.) The petitioner correctly points out that ineffective assistance of counsel on direct appeal can establish cause to excuse a procedural default. (ECF No. 71, at 3, 12–13 (citing *Reed v. Ross*, 468, U.S. 1 (1984) and *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986)).) He pointedly fails to acknowledge, however, that one of the very cases on which he relies establishes that ineffective assistance on direct appeal **cannot** be relied upon as cause **unless that claim itself has been exhausted** in state proceedings:

> Ineffective assistance of counsel, then, is cause for a procedural default. However, we think that the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," *Rose v. Lundy*, 455 U.S. 509, 518 (1982), generally **requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default**. . . . The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court "to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," *Darr v. Burford*, 339 U.S. 200, 204 (1950), and that holds true whether an ineffective assistance claim is

---

[3] The petitioner's reply brief is inconsistent regarding which type of cause the petitioner asserts for the default of this claim. He lists this claim in his preliminary list of claims falling within the scope of his "IAC on Direct Appeal" argument. (ECF No. 71, at 12–13.) But when he eventually reaches this specific claim, he asserts only that "Petitioner's post-conviction counsel's failure to raise this issue constitutes ineffective assistance of counsel which provides cause for any procedural default of this claim," citing *Martinez*. (ECF No. 71, at 53.) The court finds that the outcome is the same under either theory.

[4] Again, the petitioner's reply brief is confusing with regard to the cause asserted for default of this claim. The petitioner does not include the claim on his initial list of claims affected by his "IAC on Direct Appeal" argument (ECF No. 71, at 12–13), and he notes that "this claim could not have been presented on direct appeal, for obvious reasons." (ECF No. 71, at 57 n. 24.) Yet he specifically asserts, to the exclusion of any other purported cause, that "Petitioner's appellate counsel's failure to raise this issue on direct appeal was ineffective assistance of counsel which constitutes cause to excuse any procedural default." (ECF No. 71, at 57.) As with Claim 19, the outcome is the same under either framework.

[5] Procedural default aside, this claim would also be subject to summary dismissal on the basis that "[t]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

*Murray*, 477 U.S. at 488-89 (emphasis added). Because the petitioner's ineffective assistance of appellate counsel claim (Claim 16) was itself procedurally defaulted, and that default is not excused, as discussed in the following section, he cannot rely on that claim as cause to excuse default of these underlying claims. They must, therefore, be dismissed.

The petitioner claims that ineffective assistance of post-conviction counsel establishes cause for the default of Claim 4 (witness intimidation by prosecutor). (ECF No. 71, at 26.) Specifically, the petitioner asserts that post-conviction counsel's failure to raise this claim provides cause under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). The law in this circuit is perfectly clear, however, that the *Martinez* exception is strictly limited to claims of ineffective assistance of trial counsel:

> We will assume that the Supreme Court meant exactly what it wrote: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true *except* as to initial-review collateral proceedings for claims of ineffective assistance of counsel *at trial*." [*Martinez*, 132 S. Ct.] at 1316 (emphasis added).

*Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013), *cert. denied sub nom. Hodges v. Carpenter*, 135 S. Ct. 1545 (2015), *reh'g denied*, 135 S. Ct. 2345 (2015). The petitioner's only argument against application of that law to his claims is that "*Hodges* was wrongly decided and is destined to be reversed." (ECF No. 71, at 7.) The court understands the petitioner's desire to preserve this issue, but is bound to follow the clear and unambiguous precedent of *Hodges*. Accordingly, the petitioner has failed to establish cause for the default of Claim 4 under *Martinez*, because it is not a claim for ineffective assistance of counsel at trial.[6]

The petitioner argues in the alternative that the state's failure to provide investigators to assist him on post-conviction and/or the prosecution's failure to disclose its contact with the

---

[6] To the extent that the petitioner relies on *Martinez* and the ineffective assistance of post-conviction counsel to establish cause for the default of Claims 19 (prejudicial photographs) and 23 (inadequate review process), his reliance is misplaced for the same reason.

witness provides cause for the default of this claim. (ECF No. 71, at 27.)  But the second amended petition affirmatively states that "[p]rior to Petitioner's trial, Clark contacted Petitioner's trial counsel and informed them that he was being pressured by the prosecutor to say that Petitioner fired his gun first and that his pending gun charge was being used as leverage against him by the prosecutor to force him to say that Petitioner fired first." (ECF No. 30, at 63.)  Thus, it is apparent from the face of the operative petition that the petitioner was aware of the necessary facts to assert this claim even before trial,[7] and his failure to do so was not caused by any "objective factor external to the defense" as required to establish cause to excuse the default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  This claim is therefore procedurally defaulted without cause, and must be dismissed.

With regard to the default of Claim 15 (*Brady* violation), the petitioner asserts as cause: (1) the prosecution's suppression of the relevant facts, (2) ineffective assistance of counsel on direct appeal; and (3) ineffective assistance of post-conviction counsel under *Martinez*. (ECF No. 71, at 46–48.)  For the reasons set forth above, the petitioner may not rely on an ineffective-assistance-of-appellate-counsel claim, which is itself defaulted, as cause for the default of an underlying claim.  Nor may he rely on *Martinez* with respect to the default of any claim other than one for ineffective assistance at trial.  This leaves only the alleged suppression of relevant facts, which of course is also an element of the *Brady* claim, as a possible cause for the default.

The petitioner is correct that the prosecution's suppression of *Brady* material can constitute cause for the failure to exhaust a *Brady* claim.  *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).  But in order for information to be considered suppressed for *Brady* purposes, and thus for the purpose of establishing cause, the information must be in the possession of the

_____

[7] In fact, the intervening criminal charge against Clark and the extent to which he did or did not feel pressured to testify that the petitioner shot first in light of that charge was the topic of extensive direct and cross-examination at trial in front of the jury, where he ultimately testified that he did not know who shot first. (ECF No. 34-11, at 40–41, 47–50, 55–58, 61–63.)  In addition to establishing lack of cause for the default of this claim, these circumstances would likely prevent the petitioner from demonstrating any prejudice arising from the alleged misconduct.

prosecution team. *See Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) ("[T]he state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation.") (quoting *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002)).

The operative petition alleges that the petitioner discovered a witness's mental illness through "recent investigation." (ECF No. 30, at 78.)   Recent declarations submitted with his reply[8] indicate that in November 2013, the witness seemed "disjointed and confused" during a conversation with the petitioner's investigator, and a close acquaintance of the witness stated that the witness had unspecified "'serious mental problems' that have been on-going for 'years and years'" (ECF No. 71-8, at 3), that the petitioner's trial counsel was unaware of the witness's mental health issues until after the present habeas action was filed, and that the prosecutor never provided any information to her about the witness's mental health. (ECF No. 71-1, at 4.) But nowhere in any of his submissions to this court does the petitioner allege that information pertaining to the witness's alleged mental illness was in the possession of the prosecution team at the time of trial.[9]   The petitioner has therefore failed to establish cause to excuse his default of this claim, and failed to satisfy the suppression prong of a *Brady* claim. *See Williams v. Armontrout*, 912 F.2d 924, 931 (8th Cir. 1990) (holding that petitioner "failed to establish the first prong of the *Brady* test ... because the state cannot suppress evidence ... it does not possess"). This claim will be dismissed.

---

[8] Where a claim has been adjudicated on the merits in state court and a petitioner seeks relief under 28 U.S.C. § 2254(d)(1), federal court review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  It would thus be improper for this court to consider new evidence with respect to an exhausted claim.  However, this claim was never raised in state court, and this court has considered these declarations only as they pertain to the question of cause to excuse procedural default.

[9] In this action, the petitioner has sought (and been denied) leave to subpoena mental health records from the witness's high school and from the respondent, but has not requested any discovery with regard to such records in the prosecution's file. (ECF No. 53, at 5.)

## 2.    *Claims Defaulted on Post-conviction Appeal*

Additionally, the respondent asserts that Claims 2 (counsel's conflict of interest), 5 (ineffectiveness of trial counsel in failing to move to suppress petitioner's statement), 7 (double jeopardy), 8 (ineffectiveness of trial counsel in failing to challenge prior conviction), 9 (ineffectiveness of trial counsel concerning sleeping jurors), 16 (ineffectiveness of counsel on direct appeal), 18 (trial court error in instructing jury on elements of second-degree murder) and 22 (juror misconduct) are procedurally defaulted because, although they were raised in the trial level post-conviction court, they were not raised in the subsequent appeal.  Again, the petitioner does not dispute that the claims were procedurally defaulted on post-conviction appeal, but he asserts that ineffective assistance of post-conviction appellate counsel is cause to excuse all of these defaults. (ECF 71, at 6–12.)

It is well settled, however, that ineffective assistance of counsel during post-conviction appeal does not constitute cause to overcome procedural default. *Coleman v. Thompson*, 501 U.S. 722, 742–53 (1991); *Martinez v. Ryan*, 132 S. Ct. at 1320 (new exception "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings").  Specifically, the *Martinez* exception does not apply to claims that were raised at the post-conviction initial-review proceeding but not preserved on post-conviction appeal.[10] *West v. Carpenter*, 790 F.3d 693, 698–99 (6th Cir. 2015).  This is because a petitioner whose claims were heard on the merits on post-conviction initial review has received the opportunity *Martinez* was fashioned to guarantee: to ensure that "the claim will have been addressed by **one court**, whether it be the trial court, the appellate court on direct review, or the trial court in an initial review collateral proceeding." *Martinez*, 132 S. Ct. at 1316 (emphasis

---

[10] Moreover, even if the *Martinez* exception applied to defaults on post-conviction appeal, it is strictly limited to underlying claims of ineffective assistance at trial, as discussed above, and would therefore have no effect on at least half of the claims in question. *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

added).  Accordingly, mere ineffective assistance of post-conviction appellate counsel does not qualify as cause to excuse claims defaulted at that stage of proceedings.

The Supreme Court has observed, however, that there is an "essential difference between a claim of attorney error, however egregious, and a claim that an attorney had essentially abandoned his client." *Maples v. Thomas*, 132 S. Ct. 912, 923 (2012).  In *Maples*, the death row petitioner's *pro bono* counsel left the law firm at which they had begun representation and took other employment that prevented them from continuing to represent him. *Id.* at 916.  They did not inform the petitioner of their move, seek permission to withdraw from his case or move for the appointment of new counsel. *Id.* at 916–17.  Notice of the trial court's denial of post-conviction relief was mailed to them at their former firm and returned unopened as undeliverable, and the time within which an appeal could have been filed expired with no action taken on the petitioner's behalf. *Id.* at 917.  The state court of criminal appeals denied the petitioner's request to file a late appeal. *Id.* at 921.  His claims were thus defaulted. The Supreme Court determined that "the uncommon facts" of that case established cause to excuse the petitioner's procedural default of his claims, because he had been "[a]bandoned by counsel," "left unrepresented at a critical time for his state postconviction petition," "left without any functioning attorney of record," and "lacked the assistance of any authorized attorney" during the time within which he could have appealed the denial of post-conviction relief. *Id.* at 917, 922, 927.  The basis for the court's decision was that an attorney who abandons a client without notice severs the principal-agent relationship, such that the attorney's failure to act may no longer be fairly imputed to the former client. *Id.* at 922–23.

The petitioner in this case asserts that ineffective assistance of his post-conviction appellate counsel, Hershell Koger, amounted to "extreme negligence and ultimate abandonment" and constitutes cause to overcome procedural default under *Maples*. (ECF No. 71, at 6–12.)  Specifically, the petitioner asserts that Koger failed to communicate with him

about his case, despite the petitioner's repeated efforts to reach him, directly and through his previous attorneys. He further asserts that Koger missed his filing deadline and simply "slapped together a brief after being alerted by a court officer and his client of his dereliction." (ECF No. 71, at 11.) The petitioner has submitted state court records demonstrating that Koger first filed a motion for extension of time to submit his brief, which was granted, filed a late second motion for extension, which was also granted, finally filed the brief more than a month after the new deadline, and followed up weeks later with a motion to late-file brief in which he explained that his oversight in missing the deadline was caused by out-of-town preparation for a complex criminal trial. (ECF 71, at 8–9; ECF 71-3.) The petitioner also asserts that in the brief he ultimately filed, Koger failed to raise "the best and most obvious issues" for appeal. (*Id.* at 10.) The brief in question is 17 pages long and raises three claims of ineffective assistance of counsel, including the claims presented as Claims 6 and Claim 13 of the current habeas action. (ECF No. 34-28.)

Assuming that petitioner's description of Koger's handling of his appeal is accurate, it likely falls below the standards of professional conduct for attorneys, including Rules of Professional Conduct 1.3 (requiring reasonable diligence and promptness in representing a client) and/or 1.4 (communication with client), and the petitioner is free to submit a complaint to that effect to the Tennessee Board of Professional Responsibility. But that is not the standard that applies to the question before the court. Dereliction, neglect or ineffectiveness does not constitute the total abandonment required to establish cause under *Maples*. During the relevant time period, counsel did continue to represent the petitioner, however tardily or poorly. The delay in filing the brief was not held against the petitioner, as the state court accepted the late brief and ruled on the merits of the case. While the petitioner finds the brief to be deficient, there is no doubt that counsel was acting on behalf of the petitioner when he submitted it. Koger's omission of "the best and most obvious" issues from the appellate brief, allegedly

without "conceivable strategic justification" (ECF No. 71, at 10), would bear upon the deficient performance prong of a claim of ineffective assistance, but does not constitute abandonment, as another district court in this circuit has explained:

> Even if counsel was incompetent under *Strickland* for failing to raise Bell's ineffective assistance of counsel claim, counsel did not abandon Bell. Counsel's failure to raise a particular claim, even a meritorious one, does not present the "veritable perfect storm of misfortune" visited upon the petitioner in *Maples*, which prompted the narrow exception to the rule that ineffective assistance of counsel on state-court collateral review does not serve as cause to excuse procedural default. 132 S. Ct. at 929 (Alito, J. concurring).

*Bell v. Howes*, No. 2:06-CV-15086, 2014 WL 255886, at *6 (E.D. Mich. Jan. 23, 2014). Yet another district court in this circuit has found that even the complete failure to file a brief after receiving several extensions of time does not establish cause under *Maples*, because it is "more akin to neglect, however egregious, than to abandonment." *Stojetz v. Ishee*, No. 2:04-cv-263, 2014 WL 4775209, at *110–15 (S.D. Ohio Sept. 24, 2014). District courts in other circuits have reached the same conclusion on similar facts. *E.g., Hurley v. Cassady*, No. 14-3094-CV-S-MDH-P, 2014 WL 4185510, at *7 (W.D. Mo. Aug. 21, 2014) (failure to include four colorable claims on post-conviction appeal was not abandonment, but ineffective assistance that could not constitute cause); *United States v. Soto-Valdez*, No. CV-99-1591-PHX-RCB (LOA), 2013 WL 5297142, at *23–24 (D. Ariz. Sept. 19, 2013) (filing a deficient brief after receiving multiple extensions of time was negligence, not abandonment). Failure to raise colorable claims, even when combined with lack of communication with the petitioner, has been characterized as "a claim of serious negligence, but it is not 'abandonment.'" *Ngabirano v. Wengler*, No. 1:11-cv-00450-BLW, 2014 WL 517494, at *5 (D. Idaho Feb. 7, 2014) (quoting *Moorman v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012)).

Because the petitioner was not abandoned as required to establish cause under *Maples*, and *Martinez* does not reach claims defaulted on post-conviction appeal, Claims 2, 5, 7, 8, 9, 16, 18 and 22 must be dismissed on the basis of procedural default.

## B.      Remaining Claims

### 1.      *Claim 1 – Sufficiency of the Evidence*

The petitioner claims that there was insufficient evidence at trial to support his conviction as required by due process under the Fourteenth Amendment.   The petitioner exhausted this claim on direct appeal, where the Tennessee Court of Criminal Appeals denied relief based on the following analysis:

> The Defendant's first issue is whether the evidence is legally sufficient to support his convictions for second degree murder and aggravated assault. Specifically, the Defendant argues that the evidence is not sufficient because he acted in self-defense and in defense of another. In the alternative, he argues that he killed the victim during a state of passion produced by adequate provocation and, thus, the evidence warrants a conviction for voluntary manslaughter instead of second degree murder.
>
> Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).
>
> On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.
>
> Second degree murder is defined by statute as the "knowing killing of another." See Tenn. Code Ann. § 39-13-210(a)(1). The lesser charge of voluntary manslaughter also includes the "knowing killing of another," but adds the

additional element that the killing was done "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Aggravated assault, as charged in this case, is committed when a person intentionally or knowingly causes bodily injury to another and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B).

A person acts knowingly when, with respect to a result of the person's conduct, "the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person's action may be knowing, irrespective of that person's desire that the conduct or result will occur. Tenn. Code Ann. § 39-13-102, Sentencing Commission Comments.

The Defendant argues that the State failed to negate his theory of self-defense or defense of another beyond a reasonable doubt. He does not contest that he shot the victims, but he asserts that he did so in defense of himself and Grizzard after Robison "cocked his gun." Thus, he argues that the killing was legally justified.

Tennessee Code Annotated section 39-11-611(a) provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn.Code Ann. § 39-11-611(a). Defense of a third person is set forth in Tennessee Code Annotated section 39-11-612:

> A person is justified in threatening or using force against another to protect a third person, if:
>
> (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and
>
> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn.Code Ann. § 39-11-612.

It is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the trier of fact. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury

verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *Clifton*, 880 S.W.2d at 743. Moreover, the State has the burden of negating any defense if admissible evidence is introduced supporting the defense. Tenn. Code Ann. § 39-11-201(a)(3). It is clearly within the prerogative of the jury to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). The right to defend a third person is to be determined in the same fashion as the right of self-defense. Tenn. Code Ann. § 39-11-612, Sentencing Commission Comments.

The Defendant asserts that, based upon the evidence of self-defense or defense of another presented at trial, he was legally justified in shooting the victims. He notes that, "from the testimony of the four prosecution witnesses, ... no coherent account emerges concerning several material facts, such as the timing of the shooting, Chris Grizzard's location immediately prior to the shooting, whether Wayne Robison had his gun cocked, and who shot first." He further points to the facts that he was not initially involved in the dispute about the stolen money and that he was aware that Robison and Shawn Pillow were armed. Alternatively, he argues that the evidence supports, at best, a conviction for voluntary manslaughter.

In this case, the Defendant's sufficiency argument is based upon witness' credibility. Examining the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to sustain the Defendant's convictions for second degree murder and aggravated assault. The proof showed that, following an argument between Grizzard and Robison, the Defendant approached the vehicle and began firing. According to testimony presented at trial, Robison had previously shown his empty hands, indicating that he did not intend to fire a weapon. The jury heard testimony from two eyewitnesses that the Defendant was the one who fired first. There was also testimony from one witness that he did not. As noted above, this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236. Furthermore, questions about the credibility of witnesses, the weight and value of the evidence, as well as factual issues raised by the evidence are to be resolved by the trier of fact. *Id.*

The jury was not obligated to accept the Defendant's testimony as to self-defense. The issue of self-defense in a murder prosecution is always a question of fact to be determined by the trier of fact. In summary, there was ample evidence to support the jury's finding in this case that the Defendant "knowingly" killed one victim and fired upon the other two. We conclude that the State did negate the Defendant's theory of self-defense and that the evidence was sufficient to establish the certainty of guilt of the accused.

Regarding the Defendant's argument that the evidence supports only a conviction for voluntary manslaughter, it was a question for the jury whether the Defendant knowingly committed second degree murder or whether he acted under "adequate provocation." *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The jury was under no obligation to accept the Defendant's contentions that the killing was committed in a state of passion. A reasonable jury could have justifiably found that the provocation suffered by the Defendant was inadequate. In any event, that decision, made under proper instructions and

consideration of all the evidence, is within the exclusive province of the jury. There was ample evidence to support the jury's verdict of second degree murder.

*State v. Young*, No. M200501873CCAR3CD, 2008 WL 2026108, at *3-6 (Tenn. Ct. Crim. App. May 12, 2008).

The right to due process guaranteed by the Constitution ensures that no person will be made to suffer the onus of a criminal conviction except upon sufficient proof. The evidence is sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The state court accurately identified this standard, and analyzed the evidence presented at trial in light of it. The petitioner's claim is that the state court's analysis was unreasonable, though it is not entirely clear whether he claims that the decision involved an unreasonable application of the law under § 2254(d)(1) or an unreasonable determination of the facts presented at trial under § 2254(d)(2). (*Compare* ECF No. 71, at 16 ("But the Tennessee Court of Criminal Appeals did not make any pure fact findings. The TCCA's decision is a legal conclusion."), 17 (state court's analysis amounted to "spinning the evidence to make it appear to be what it is not and an unreasonable application of the facts under 28 U.S.C. § 2254(d)(2)"), and 18 (state court's analysis was "contrary to and an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).")))

Regardless of the prong under which he is proceeding, the petitioner's position boils down to the argument that a rational trier of fact would not "ignor[e] a mountain of evidence" supporting self-defense in favor of "a[n] exceedingly small molehill of evidence" supporting guilt (ECF No. 71, at 18), with a lengthy discussion of the evidence on both sides of the scale. But a federal court reviewing the sufficiency of the evidence on habeas review may not re-weigh evidence or redetermine witness credibility. *Marshall v. Lonberger*, 459 U.S. 422, 434, (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of

witnesses whose demeanor has been observed by the state trial court, but not by them."). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear on the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296–97 (1992). The state court correctly observed that there was conflicting testimony at trial about who fired first and about whether the circumstances were such that the petitioner could have believed he needed to shoot in defense of himself or someone else. Victims Shawn Pillow and Wayne Robison both testified that they saw the petitioner fire first (ECF No. 34-9, at 77–78; ECF No. 34-10, at 21), and Pillow and David Clark both testified that they saw Robison put his hands in the air and deny that he was doing anything before the shooting started. (ECF No. 34-10, at 21; ECF No. 34-11, at 29.) The court presumes that the jury credited those accounts over the conflicting evidence in convicting the petitioner. Accordingly, the state court's conclusion that there was sufficient evidence to support the verdict was not unreasonable, and this claim fails on the merits.

### 2. Claim 3 – Extraneous Document in Jury Room

The petitioner alleges that a "prejudicial and extraneous piece of paper" reflecting the state's theory of the case against him was erroneously sent to the jury room during deliberation, and that the state court's denial of his petition for writ of error coram nobis on that basis "is contrary to and an unreasonable application of clearly established federal law and an unreasonable application of the facts." (ECF No. 30, at 56–62; ECF No. 71, at 24.) The petitioner exhausted this claim in his consolidated direct appeal, and the state court denied relief on the merits. Its recitation of the relevant facts and subsequent analysis are set forth herein:

> On June 23, 2006, the Defendant filed a petition for writ of error coram nobis, arguing that the trial court should grant him relief on the basis of newly discovered evidence in the form of an extraneous and prejudicial chart that went to the jury room during deliberations. The Defendant's counsel was reviewing the record on appeal and noticed a large chart created by the prosecutor during her direct examination of David Clark, which was not labeled as an exhibit. The chart

reflected the inconsistencies in Clark's various statements regarding who shot first and the time frames in which those statements were made. The Defendant contends that this extraneous, prejudicial document went to the jury room and that, if the trial court had known of the document's presence in the jury room, there was a reasonable probability a mistrial would have been granted. Thereafter, a hearing was held on the request for coram nobis relief.

Nicole Murphy, a clerk with the Davidson County Criminal Court Clerk's Office, testified that, when she was preparing the record to send to the Appellate Court Clerk's Office, she found exhibit 7 (a diagram of the scene created by David Clark) "that had a piece of paper folded inside of it that wasn't marked." She admitted that she did not alert anyone to the presence of the document. Matt Lockridge, also an employee of the Davidson County Criminal Court Clerk's Office testified that, as a part of his duties, he checked items in the clerk's office property room. He did not recall the document in question and stated that, if he had seen the document in the record, he would have alerted someone to its presence.

Aaron Gray, the trial judge's "in-court clerk," testified that his responsibilities included documenting all exhibits during a trial and compiling an exhibit list. He commented that this case was tried twice and that the documents were not renumbered from the first trial. According to Mr. Gray, any document marked for identification purposes only did not go to the jury room. Mr. Gray testified that, while he did not have any specific recollection of this case, there was a standard procedure in place to prevent "ID Only" exhibits from going to the jury room and "we don't deviate from that procedure."

Mr. Gray acknowledged that there was no mention of this chart on the exhibit list. He further opined that the exhibit was not viewed by the jury during its deliberations. When asked if an error occurred by this document's presence in the property room, Mr. Gray admitted that its presence in the record was a "mistake."

Next, Chris Austin, the trial judge's court officer, testified and described his responsibilities as overseeing courtroom proceedings. He stated that, as a part of his responsibilities, he examined the exhibits at the conclusion of a trial and made sure that only exhibits identified and accepted into evidence went into the jury room. When asked if he had any specific recollection of this case and this exhibit, he responded, "What I can say is me and Mr. Gray followed the procedure, but I know that when I brought the exhibits back that was not a piece of it or I would've made someone aware of it." He testified that he gathered the exhibits from the jury room at the conclusion of trial, compared them with the exhibit list, and then took them to the property room.

Emma Rae Tennent of the Metropolitan Nashville Public Defender's Office testified that she represented the Defendant on his appeal in this case. She testified that she inspected the record on appeal and discovered the chart "[f]olded up inside" of exhibit number 7. She determined from the trial transcript that the chart was made during the course of David Clark's testimony because the chart tracked various portions of his testimony. Ms. Tenant acknowledged that the closing statements were not transcribed.

Robert J. Windell testified that he was an unpaid intern in the public defender's office and that he participated in interviewing the twelve jurors in this case. He stated that each juror was shown a copy of the unmarked chart and of exhibit 7 and were asked if they recalled these documents.

Daniel Jones testified that he was a juror in this matter. He stated defense counsel visited him and showed him two documents (the unmarked chart and exhibit 7). Mr. Jones remembered the unmarked chart "vividly." When asked when he had previously viewed the document, he answered, "I know I've viewed it in the courtroom and I believe it may have been in the jury room as well, yes." He stated that he was between "80 and 90 percent certain" that he saw the document in the jury room. He could not recall whether the document was discussed by the jury during its deliberations.

Bernie Lynch, also a juror in this case, testified that he recalled seeing the unmarked chart during jury deliberations. When asked if he remembered whether the document was discussed by the jurors, he responded, "Oh, I'm sure it was. I mean, because-I mean, we talked about just about everything that was in there." On cross-examination, his testimony became somewhat equivocal on whether the document was actually present in the jury room or was just discussed during deliberations.

After hearing testimony, the trial court entered an extensive order denying the Defendant coram nobis relief. The case is now properly before this Court.

. . .

As his final issue, the Defendant argues that the trial court erred in denying his petition for writ of error coram nobis. On appeal, the Defendant argues that he is entitled to error coram nobis relief because, through no fault of his own, "a prejudicial and extraneous piece of paper measuring 27″ by 33″ and captioned in red with the State's theory of the case was improperly sent to the jury room as substantive evidence for consideration by the jury." He contends that a new trial should be granted.

. . .

The Defendant cites to *State v. Malinda L. Mason*, No. M2005 -01961-CCA-RM-CD, 2005 WL 3038612 (Tenn. Crim. App., Nashville, Nov. 10, 2005), to support his argument that the jury was exposed to extraneous information and a new trial is warranted. According to the Defendant's allegations, the newly discovered evidence is a poster-size document summarizing the testimony of an eyewitness who gave inconsistent accounts of who shot first in this homicide case. In *Mason*, this Court made the following statement: "It would be hard to conclude under any scenario that a written summary of any prosecution witness's testimony, not made an exhibit, and presented to a jury during deliberations, would not be prejudicial." 2005 WL 3038612, at *4.

The trial court noted that the initial inquiry is whether the jury was actually exposed to the information. It is well-settled law that, "when it has been shown that a juror was exposed to extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden

shifts to the State to explain the conduct or demonstrate that it was harmless." *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005). The trial court recounted the testimony given at the coram nobis hearing and concluded, "[T]he Court is not satisfied that [the Defendant] has carried his burden that [the unmarked chart] or the 'non-exhibit' was viewed by the jury during deliberations...." The court gave several reasons in support of its opinion: that there were multiple safeguards in place to prevent the submission of extraneous information to the jury, that there was a significant likelihood of discovery of any mistake, that Mr. Lockridge signed the exhibit list as accurately describing all exhibits submitted to him, and that the jurors' testimony was not corroborated by the other jurors.

The trial court, assuming arguendo that the document was viewed by the jury, also stated, "[T]his [c]ourt finds no evidence to support the proposition that the inclusion of the non-exhibit during jury deliberations may have affected the judgment in this case." The trial court distinguished the *Mason* case, correctly reasoning that, in this case,

> the extraneous information was created by the assistant district attorney in open court in front of the jury representing a synopsis of the witness' testimony given in open court in front of the jury.... There is nothing extraneous about what was contained in the document and no inference could be drawn that any of the information was endorsed by the district attorney general or the Davidson County Grand Jury.

The trial court further differentiated this case from *Mason*, stating as follows:

> In this case, the notations on the document addressed the credibility of the witness actually testifying.... Unlike *Mason*, this summary of the prosecuting witness' testimony is not corroborative of other testimony. In fact, it contradicts the testimony of other eyewitnesses and, therefore, is favorable to [the Defendant], if the jury elected to accept this testimony after weighing his credibility.

Addressing the Defendant's assertion that the document memorialized the State's theory of the case, the trial court found, "If it did, then the jury's only logical conclusion would be that the State doesn't know what happened." As also noted by the trial court, if the Defendant believed the document to be inaccurate, then the Defendant could have objected. Again, we note that the jury was instructed that it should base its decision on the proof offered at trial, not the arguments of counsel.

The Defendant contends that, "had the error been discovered prior to the verdict, the trial court would have had an opportunity to consider whether a curative instruction would suffice to protect the [D]efendant's rights, or whether a mistrial was required." The trial court determined, "It is not the consideration of a mistrial that is relevant. That is obligatory. The issue is whether the mistrial was a reasonably legitimate consideration, which it was not in this case." The trial court also discussed the evidence presented at trial and stated that "[t]he document did

> not bring to the juries [sic] attention evidence not otherwise presented to them. They heard that evidence and rendered their verdict on that evidence."
>
> To the extent that the Defendant raises a cognizable claim under the error coram nobis statute, the Defendant has failed to establish that the subsequently or newly discovered evidence might have resulted in a different judgment had it been presented at the trial. We agree with the rationale provided by the trial court in its extensive and thorough order. We conclude that the trial court did not err or abuse his discretion by denying the petition.

*State v. Young*, No. M200501873CCAR3CD, 2008 WL 2026108, at *2–3, 11-14 (Tenn. Ct. Crim. App. May 12, 2008).

The petitioner asserts that the state court's decision "is contrary to and an unreasonable application of clearly established federal law and an unreasonable application of the facts." (ECF 71, at 24.)  The primary basis for the coram nobis trial court's denial of relief, which the appellate court essentially adopted, was that – as a matter of fact – the petitioner had not established that the jury had the chart in question during deliberation.  According to the petitioner, that determination was unreasonable because "[t]he court reached that conclusion by assuming that the court officers had discharged their duties," despite "objective testimony of [two] jurors" "that they recalled [the chart] in the jury room and that the jurors utilized the exhibit in their deliberations." (*Id.*)  But the court did not simply imagine that the court officers' procedures prevented the unadmitted document from going to the jury room.  It reached that conclusion based on evidence that the responsible individuals "unequivocally deny that the non-exhibit was included with the exhibits that were submitted to the jury." (ECF No. 34-19, at 83.)

Review of the coram nobis hearing transcript confirms that in-court clerk Aaron Gray testified that the standard procedure followed before the physical delivery of exhibits to the jury room involved his personally handing the exhibits to court officer Chris Austin and their checking each one off the exhibit list together before Austin takes them to the jury, and that they never deviate from that procedure. (ECF No. 34-20, at 15.)  Gray acknowledged that hours of emails from the petitioner's counsel had caused him to concede essentially that anything is possible,

but testified that "[i]f you want to know what I think, it didn't go back there," and "if you asked me the question right now, I'll be adamant about it right now." (ECF No. 34-20, at 41–42, 44.) Gray acknowledged that an error had to have occurred at some point for an unmarked document to wind up in the property room or appellate record, but testified that in his view, keeping extraneous documents out of the property room is not as critical as keeping them out of the jury room where they could affect decisions. (ECF No. 34-20, at 46–47.) He testified to the effect that because of the "much higher degree of precaution" exercised in sending documents to the jury room, it would be more likely that the error occurred later in the chain of custody, although he could not say when or how it happened with certainty. (ECF No. 34-20, at 49–50.) Court officer Chris Austin also testified at the hearing. When asked if he could "state with certainty that the exhibit that's the bone of all the contention did not go back into the jury room," he responded "Yes, ma'am," and later added that "I know what [sic] when I brought the exhibits back that was not a piece of it or I would've made someone aware of it." (ECF No. 34-20, at 52.) He testified that "I would've seen it if it was there because we checked off every piece of paper that I gathered in that jury room," and that he was "certain" the document did not go to the jury. (ECF No. 34-20, at 58, 62.)

By comparison, the testimony of the jurors who appeared at the hearing was much more ambivalent. Mr. Jones testified with regard to the document at issue that "I know I've viewed it in the courtroom and I believe it may have been in the jury room as well," although he did not recall any discussion about the document in the jury room. (ECF No. 34-21, at 10. 17.) He did not remember whether trial exhibit 7 was in the jury room (ECF No. 34-21, at 15), although there is no dispute that it was. Similarly, Mr. Lynch testified that he was "pretty sure" he saw the relevant document in the jury room (ECF No. 34-22, at 15), but later stated that he recalled seeing the relevant document "somewhere," but could not remember whether it was in the

courtroom or the jury room. (ECF No. 34-22, at 19.) He summarized his position on redirect examination by petitioner's trial counsel:

> No, I said – I'm telling you now that I remember seeing it in the courtroom or the jury room, I don't remember which one, I looked at all, you know, everything that was where, like I said, I can't say exactly. I'm not going to say that I did see it in there because I might be wrong, I don't remember where I saw it, but I did see it, I mean, I paid attention to all of it, but I don't remember if it was in – I don't know what else I can say.

(ECF No. 34-22, at 21.) Based on this testimony, it was reasonable for the state court to conclude that it was possible that the jurors simply recalled seeing and discussing the document because it was "shown to them at great length during Mr. Clark's testimony." (ECF No. 34-19, at 84.) The state court's factual determination that the document in question did not go to the jury is supported by testimony and rational inferences and is not objectively unreasonable.

Nor is the state court's alternative finding of no prejudice contrary to or an unreasonable application of state law. A copy of the document in question appears in the state court's coram nobis record (ECF No. 34-19, at 10), and it is clear, as the state court determined, that the document simply tracks a portion of witness David Clark's testimony regarding his inconsistent statements about whether he saw the petitioner shoot first. (*See* ECF No. 34-11, at 40–49.) The document is effectively a loose timeline of Clark's four different enumerated statements, alternating between "SY shot first" and "I don't know (who shot first)" and listing events that Clark testified occurred between those statements (such as "Talked Δ" and "watched tape"). (ECF No. 34-19, at 10.) The text on the document is purely factual and chronological, without gloss or commentary by the prosecutor, and every fact reflected on the document is directly from Clark's testimony. The petitioner does not contend that the timeline inaccurately conveys the facts testified to by Clark, and in fact it was the petitioner's appellate counsel who recognized the document as a reflection of Clark's testimony. (ECF No. 34-20, at 70, 74–78.) Though the petitioner has complained that the prosecution's theory "SY shot first" is written in red on the original document, counsel acknowledged at the coram nobis hearing that "I don't

know who shot first" is also in red. (ECF No. 34-20, at 105.)  The document was created in open court in front of the jury, without objection.  Particularly in light of the testimony of two other witnesses who testified at trial that the petitioner shot first, the state court's conclusion that the inadvertent presence of this document in the jury room during deliberation would not have prejudiced the verdict or warranted a mistrial is not an unreasonable application of any federal law cited by the petitioner.

In support of his claim, the petitioner cites Supreme Court precedent generally requiring due process in criminal convictions. (ECF No. 71, at 24 (citing *Cole v. Arkansas*, 333 U.S. 196 (1948), *Gardner v. Florida*, 430 U.S. 349 (1977) and *Presnell v. Georgia*, 439 U.S. 14 (1978)).) He does not cite any Supreme Court case that establishes any standard for determining the prejudicial effect of demonstrative aids in the jury room.  The level of generality at which he frames his position is simply too great to satisfy the "clearly established" requirement of § 2254(d)(1). *See Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013) (disapproving lower court's reliance on "a broad right" to present evidence and stating that "[b]y framing our precedents at such a high level of generality, a lower federal court could transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'").  For guidance on the specific topic of extrinsic exhibits in the jury room, the petitioner relies on a decision by the United States Court of Appeals for the Eleventh Circuit, which he says "explains this clearly established federal law." (ECF No. 71, at 24–25 (citing *United States v. Pessefall*, 27 F.3d 511 (11th Cir. 1994)).   But the Supreme Court has repeatedly counseled that "Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'" *Lopez v. Smith*, 135 S. Ct. 1, at 4 (2014) (per curiam) (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1451 (2013)).   Circuit court analysis is thus "irrelevant to the question" of clearly established federal law for AEDPA's purpose. *Id.*

Moreover, even if *Pessefall* provided the appropriate standard, the state court's decision in this case was not an unreasonable application of that standard. In *Pessefall* a court officer inadvertently delivered to the jury room a government task force case agent's notes, which amounted to hearsay that would have been inadmissible as evidence. 27 F.3d at 515-16. The Eleventh Circuit applied a presumption of prejudice arising from the "extrinsic contact," but found the presumption was rebutted, in part by the fact that the notes were cumulative of trial testimony, the substantial properly admitted evidence on point, and the inadvertent submission of the document to the jury. *Id.* In this case, both the trial court and state appellate court acknowledged a presumption of prejudice based on state law, and nevertheless reasonably found, as discussed above, that the facts of the case rebutted that presumption.

Claim 3 is without merit and will be denied.

### 3.      *Claim 6 – Ineffective Assistance of Counsel Regarding Mistrial*

Petitioner's first trial ended in a mistrial, on his counsel's motion, following a witness's reference to his prior criminal history after the trial judge had expressly ordered that no such reference was to be made. *Young v. State*, No. M2010-01762-CCA-R3-PC, 2011 WL 3630128, at *1, 4 (Tenn. Ct. Crim. App. Aug. 18, 2011) (Docket Entry No. 34-30). The petitioner claims that his trial counsel was ineffective for not moving that the mistrial be entered with prejudice, so double jeopardy would have foreclosed the second trial at which he was convicted. The petitioner exhausted this claim in post-conviction proceedings, and the state court of criminal appeals affirmed the denial of relief based on the following analysis:

> In its memorandum opinion, the post-conviction court concluded that trial counsel was "motivated to seek the mistrial as a result of Officer Chad Mahoney's blatant disregard of the [c]ourt's admonitions and instructions, which were clear and unequivocal." The court found no evidence that the prosecutor was "complicit in the acts of the officer" or that any tactical advantage could be gained by the State by prompting a mistrial. The court determined that the petitioner could not have supported a claim that his retrial was barred by principles of double jeopardy.
>
> We agree.

A retrial of a defendant following the declaration of a mistrial may implicate concerns for a violation of principles of double jeopardy. Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. Amend. V; Tenn. Const. art. 1, sec. 10. When a mistrial is declared without the consent of the accused and without the manifest necessity of a mistrial, retrial is barred by double jeopardy principles. *State v. Skelton*, 77 S.W.3d 791, 798–99 (Tenn. Crim. App. 2001); *see State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) ("Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge.")."The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Id.*

As a component of this constitutional protection, an accused has the right "to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689 (1949). Nevertheless, the protection is not absolute in the sense of guaranteeing the enforcement of the criminal laws in one proceeding. *See Oregon v. Kennedy*, 456 U.S. 667, 672 (1982). That is, double jeopardy principles do "not go so far as to compel society to so mobilize its decision making resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error." *United States v. Jorn*, 400 U.S. 470, 484 (1971). Trial errors, in other words, are addressed through a defendant's right to appeal, not the double jeopardy clause. *See Beringer v. Sheahan*, 934 F.2d 110, 113 (7th Cir.), *cert. denied*, 502 U.S. 106 (1991).

Considering the interests sought to be protected by the double jeopardy clause, it logically follows that if a defendant requests a mistrial, he gives up the right to a verdict by the empaneled jury. Double jeopardy principles, it is recognized, do not bar a retrial in that situation. *See United States v. Dinitz*, 424 U.S. 600, 606–11 (1976). An exception to this general rule exists, however, in the very limited context when prosecutorial misconduct supplies grounds for a defense motion for mistrial, and the misconduct "was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679. "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy*, 456 U.S. at 675. This standard "merely calls for the court to make a finding of fact." *Id.* To emphasize the point, the Supreme Court stated,

> We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

*Id.* at 678. The standard set forth in *Oregon v. Kennedy* has been adopted in Tennessee and would have controlled in the petitioner's case. *See State v. Tucker*, 728 S.W.2d 27, 32 (Tenn. Crim. App. 1986).

Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, we have often considered (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the State's proof, and (3) whether the trial court promptly gave a curative instruction. *See State v. William Dotson*, No. 03C01–9803–CC–00105, slip op. at 9 (Tenn. Crim. App., Knoxville, June 4, 1999).

The post-conviction court found that the petitioner failed to show by clear and convincing evidence in the post-conviction proceeding that he would have or could have prevailed on a pretrial double jeopardy argument. The court concluded that, had the double jeopardy issue been raised prior to retrial, it would have determined that the improper testimony about the petitioner's history of parole was a gratuitous declaration and that, essentially, the State's case was relatively strong. Based on such findings, we agree that the petitioner could not have supported a claim that his retrial was barred by principles of double jeopardy. The upshot of that well-based determination by the post-conviction court is that the petitioner failed to establish that he was prejudiced by his trial counsels' failure to raise the double jeopardy bar prior to retrial.

*Young v. State*, No. M2010-01762-CCA-R3PC, 2011 WL 3630128, at *4-5 (Tenn. Ct. Crim. App. Aug. 18, 2011).

Claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. Mere attorney ignorance or inadvertence will not constitute "cause" unless the error rises to the level of a constitutional violation. *See Coleman*, 501 U.S. at 752–55. The "prejudice" component of the claim "focuses on the question

of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

In assessing counsel's performance, a reviewing court must be highly deferential and avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court must determine whether, under the circumstances, counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690. In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of

an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Looking first to the prejudice prong, the parties agree that the state court correctly identified *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982), as the standard applicable to the double jeopardy issue underlying this claim. (ECF No. 33, at 33; ECF No. 71, at 32.)  In that case, the state's expert witness testified that he had not done business with the defendant, and the prosecutor asked "Is that because he is a crook?" *Id.* at 669.  The defendant moved for and was granted a mistrial based on the prosecutor's question, and moved to dismiss the charges on double jeopardy grounds before retrial. *Id.*  The trial court denied the motion to dismiss, finding that "it was not the intention of the prosecutor in this case to cause a mistrial." *Id.*  The state court of appeals agreed that the prosecutor did not intend to cause a mistrial, but held that double jeopardy barred retrial because the prosecutor's conduct constituted "overreaching" that left the defendant "with a 'Hobson's choice – either to accept a necessarily prejudiced jury, or to move for a mistrial and face the process of being retried at a later time.'" *Id.* at 670 (quoting 619 P.2d 948, 950 (Or. Ct. App. 1980)).  The Supreme Court granted certiorari and reversed, making clear that when a defendant moves for mistrial, the prosecutor's intent to cause a mistrial is an absolute requirement for double jeopardy to bar retrial: "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Kennedy*, 456 U.S. at 675–76.

Nowhere in the petitioner's operative petition or his reply does he even allege that the prosecutor intentionally provoked the mistrial in his first trial.  Nor does he cite any evidence that would make the state court's decision that the witness's reference to his previous criminal history was a "gratuitous declaration" unreasonable.  At the post-conviction hearing, the

petitioner's trial counsel acknowledged that the prosecutor simply asked the witness if he ascertained the petitioner's identity, and the witness responded that the petitioner showed him his parole card.[11] (ECF No. 34-27, at 79.)  The post-conviction trial court observed the lack of evidence that the prosecutor intentionally provoked a mistrial:

> [T]he record is devoid of any evidence that the State prosecutor was complicit in the acts of the officer, directly or circumstantially.  The State had made no effort to continue the trial, the prosecutor demonstrated that she was well prepared to proceed and there was nothing to suggest that any tactical advantage was to be gained by a postponement.  Notwithstanding trial counsel's failure to seek a mistrial with prejudice, the record reflects that such a request would not have been supported under the circumstances.

(ECF No. 34-27, at 63.)  The petitioner's entire argument for the unreasonableness of this conclusion is that "[i]t is difficult to reconcile . . . with the fact that the police officer gave improper testimony only minutes after he had been told not to do so." (ECF No. 71, at 32.) While the witness's behavior may reflect poorly on his own judgment or intentions, the state court reasonably found that there was no evidence to implicate the prosecutor in any improper intentions.

There was no reasonable probability that mistrial with prejudice would have been granted on the facts before the state court.  Accordingly, the petitioner was not prejudiced by his counsel's failure to seek mistrial with prejudice, and this claim fails on the merits, regardless of any alleged deficiencies in counsel's performance.

### 4.    Claim 11 – Admission of Chart Created at Prosecutor's Direction

The petitioner claims that the prosecutor improperly characterized evidence and testified through her witness by directing firearm tool mark expert Kendall Jaeger to create a chart that included facts testified to by other witnesses, of which he had no personal knowledge.  The

---

[11] The court must rely on counsel's recollection for the exchange that prompted the mistrial, as that portion of the testimony from the first trial is absent from the record filed in this action.  The record of trial proceedings lodged with this court skips from the March 31, 2004 testimony of a previous witness in the first trial (ECF No. 34-5) to the December 3, 2014 pretrial proceedings for the second trial. (ECF No. 34-6.)

petitioner exhausted this claim on direct appeal, where it was rejected on the merits by the state

appellate court:

> As his third issue, the Defendant argues that "the trial court erred by permitting the prosecutor to, in effect, testify through expert witness Kendall Jaeger by telling him what to write in a chart that was sent to the jury room as an exhibit." The Defendant relies on *State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999), for the proposition that the statements made by the prosecutor during Officer Jaeger's direct examination amounted to an expression of her personal opinion about the veracity of previous State's witnesses.

> Officer Jaeger, testifying as an expert in firearm tool mark identification, stated that he examined the evidence in this case and prepared a report detailing his findings. During his direct examination, the prosecutor instructed Officer Jaeger to construct a three-page chart, explaining the purpose of the chart as follows:

>> Now, because there are so many different numbers involved, I want you to just explain the various-other officers have explained their part of the system, but we need to explain to the jury how it all fits together so you know what is what, where it came from and what it has to do with the case.

> In essence, the chart documented Officer Jaeger's findings detailed in his report and correlated those findings with the physical evidence presented in the case.

> Following the creation of the chart, defense counsel objected. The following colloquy then occurred:

>> [DEFENSE COUNSEL]: Your Honor, I actually wrote down some of the things this witness said about how he didn't know whose gun was whose, he didn't know where it was recovered. When [the prosecutor] made a mistake in what she was telling him to write, he wrote down her mistake, and she had to say, "Oh, I made a mistake." Exhibits aren't supposed to be the testimony of the prosecutor going back into the [jury] room. This witness has very obediently written down what she has told him to write down, but it's not his work. I strongly object to it going back to the jury room. We can't have [the prosecutor's] statements back in the jury room with the jury.

>> [PROSECUTOR]: Well, each of these items-

>> [DEFENSE COUNSEL]: His report will certainly go back and that's up to them to decipher.

>> [PROSECUTOR]: His report, no one can decipher it, because as he said, he doesn't use-everything that he wrote down was from the bags that they were written on and the officers, for example, Officer Matthews is the easiest one, he testified, like, "Bag number one goes with this. Bag number three goes with that. Number four goes with that."

THE COURT: Yes, he was doing all that up until the last page or so and then you were kind of telling him.

....

THE COURT: No, so I really need to look at it. During the first couple of pages anyway, that I can determine, he was identifying the bag from which it came from and then looked at his notes. He would say "Item number eight," then he would give his personal code, and then he would relate it to exhibit number, and then he would give his opinion as to what that was and what his conclusions were when he examined it. Towards the end, it kind of changed, I agree with that, but I'll have to look at it exactly.

At the conclusion of the State's proof, the issue was again addressed by the parties. The following exchange took place:

[DEFENSE COUNSEL]: To cut it shorter, Your Honor, actually on this example, I was objecting to [the copper jacket] [sic] than I am [the Defendant's] gun, he doesn't know whose gun it was. He can say it's from the Jennings Bryco (phonetic).

[PROSECUTOR]: You have to be able to keep the stuff straight some kind of way.

THE COURT: Another officer has already identified that particular weapon being the one that was taken from [the Defendant].

[DEFENSE COUNSEL]: Not this witness.

THE COURT: Well, no, but did you expect him to testify from the very beginning that he pulled him over out on Rollin's Market?

[DEFENSE COUNSEL]: No, sir.

THE COURT: We just spent a day-and-a-half on chain of custody. The chain of custody has been established and I am not going to make them, this officer back here, Jaeger, reestablish a chain of custody. I mean, he had-we know what that weapon was and who it belonged to.

[DEFENSE COUNSEL]: I'm not asking for chain of custody to be gone into. I'm asking for the exhibit from this officer's testimony to reflect what this officer actually knew, not what other officers testified to, not what other people knew, that's all I'm asking for. He doesn't know whose gun is whose. He can label which gun it came from and he didn't.

THE COURT: Overruled. The last page is to be taken out.

Ultimately, the trial court disallowed the third page of the chart, and the first two pages were admitted as exhibits and used by the jury in its deliberations. Officer Jaeger's report was also admitted into evidence.

Defense counsel's objection in the trial court was based upon the exhibit going to the jury room rather than misconduct by the prosecutor. Defense counsel did not move for a mistrial. On appeal, the Defendant asserts that the prosecutor improperly commented on the credibility of the State's witnesses during its examination of Kendall Jaeger and that a new trial is warranted. He points to the facts that the prosecutor directed the wording used on the chart and that Officer Jaeger had no personal knowledge about some matters listed on the chart. Irregardless of possible waiver, we conclude that either argument of the Defendant-improper comments by the prosecutor or the presence of the exhibit during jury deliberations-is without merit.

The Defendant's reliance on *Thornton*, 10 S.W.3d 229, is misplaced. In *Thornton*, this Court ruled that comments by a prosecutor that he was "very proud" of the crime lab and that "they do an excellent job" was improper argument. 10 S.W.3d at 235. Here, the prosecutor's statements made during the creation of the chart did not amount to vouching for previous testimony of State's witnesses. *See generally State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (discussing the five general areas of prosecutorial misconduct). The prosecutor was doing nothing more than accurately summarizing the evidence previously admitted in this case. The chart was simply created to aid the jury in analyzing the evidence; it was a demonstrative exhibit.

In this regard, "[d]emonstrative evidence is admissible only if relevant under Tennessee Rule of Evidence 401." *Ronald Bradford Waller v. Sate*, No. E1999-02034-CCA-R3-PC, 2000 WL 982103, at *15 (Tenn. Ct. Crim. App., Knoxville, July 18, 2000). In other words, demonstrative evidence should "assist the trier of fact in understanding and evaluating the other evidence offered at trial." *Id.* (citation omitted). Moreover, "[d]emonstrative evidence is ... often attacked ... on grounds that it is too prejudicial under Rule 403." *Id.* The admission of demonstrative exhibits is within the discretion of the trial judge, and that discretion will not be disturbed absent a clear showing of abuse. *State v. West*, 767 S.W.2d 387, 402 (Tenn. 1989).

The matters contained in the chart were in evidence, relevant to issues in the trial, and were not overly prejudicial. We conclude that the trial court did not abuse its discretion by allowing the jury to use the chart during deliberations. Even if error is assumed, the jury was instructed that it should base its decision on the proof offered at trial, not the arguments of counsel, and the evidence of the Defendant's guilt of the offenses was more than sufficient. The Defendant has failed to show he was prejudiced by the comments, and any error is harmless.

State v. Young, No. M200501873CCAR3CD, 2008 WL 2026108, at *9-11 (Tenn. Ct. Crim. App. May 12, 2008).

The issue the petitioner presented to state court on direct appeal relied exclusively on state law for the alleged impropriety of the prosecutor's actions (ECF No. 34-24, at 76–77), and the state court likewise relied exclusively on state law to reject it. In presenting this claim to this

court, the petitioner does not identify or discuss any clearly established federal law – i.e. Supreme Court precedent – setting the standard for this case. He refers generally to his "Sixth and Fourteenth Amendment rights to due process and a fair trial," but the only Supreme Court case he cites is for the equally general proposition that "while a prosecutor 'may strike hard blows, he is not at liberty to strike foul ones.'" (ECF No. 30, at 73 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).) The Supreme Court in *Berger* found a new trial was required on the basis of pervasive prosecutorial misconduct, including repeatedly misstating facts, assuming facts that were not in evidence, bullying witnesses, and arguing at closing that he personally knew that a witness knew the defendant even though the witness had been unable to identify him. *Berger*, 295 U.S. at 87–88. In contrast, the petitioner here does not dispute that the chart in question was comprised entirely of facts in evidence in the case. The state court's rejection of the petitioner's claim in this case was not an unreasonable application of the *Berger* standard, even aside from the court's misgivings about whether the federal claim was technically exhausted.[12]

### 5.    Claim 13 – Ineffective Assistance of Counsel Regarding Impeachment of Coram Nobis Witness

The petitioner claims that Amy Harwell, his trial counsel who also represented him at the coram nobis hearing, was ineffective at the latter hearing for failing to impeach witness Chris Austin with a prior inconsistent statement regarding his memory of the document in question in that proceeding (the same document at issue in the petitioner's Claim 3, addressed above). Another of the petitioner's previous attorneys, Holly Ruskin, has testified that she spoke to Mr. Austin shortly before the coram nobis hearing, and that he "stated that he did not recall specifically what happened with the chart, that he would've just followed the normal

---

[12] The petitioner alleges in a footnote that the unadmitted final page of the Jaeger document wound up in the jury room despite the trial court's order, and references Claim 3. (ECF No. 30, at 72 n.12.) It is clear, however, that the Jaeger document is definitely not the same document created by the prosecutor during David Clark's testimony that is at issue in Claim 3.

procedures," and "[h]e did not state whether or not he remembered whether or not it went back, if it did or not. He just said he just would follow the normal procedure." (ECF No. 34-27, at 121.) Intern Rob Wendell was present for that conversation and recalled that Mr. Austin said that "his procedure is not to take items that aren't evidence into the jury room," but that "he didn't have a specific memory one way or the other" about the particular item in question. (ECF No. 34-27, at 126.) Ms. Harwell explained that she did not examine Mr. Austin about the inconsistent statements because she was concerned that attacking the credibility of the court officer would have elicited disfavor from the judge.[13] (ECF No. 34-27, at 104–06.)

The petitioner exhausted this claim in post-conviction proceedings. The trial court denied relief, and the state appellate court accurately set forth the *Strickland* standard for ineffective assistance of counsel, *Young v. State*, No. M2010-01762-CCA-R3PC, 2011 WL 3630128, at *3 (Tenn. Ct. Crim. App. Aug. 18, 2011), and affirmed denial of relief on the merits:

> The post-conviction court stated in its memorandum opinion that, in rejecting the petitioner's bid to obtain coram nobis relief following trial, the court "evaluated the merits of the claim assuming the non-existent documents had in fact been erroneously submitted to the jury and concluded that it would have been harmless because there is no reasonable basis to believe that the omission of this chart may have led to a different [verdict]." As noted by this court in *Sentorya L. Young*, the coram nobis court found that
>
>> the extraneous information was created by the assistant district attorney in open court in front of the jury representing a synopsis of the witness' testimony given in open court in front of the jury.... There is nothing extraneous about what was contained in the document and no inference could be drawn that any of the

---

[13] The petitioner has submitted a recent declaration from Ms. Harwell, in which she asserts that Mr. Austin "affirmatively stated to Ms. Ruskin that he was unable to say that the NONEXHIBIT did not go into the jury room" and that when he testified to the contrary at the coram nobis hearing she "regretted that [she] did not have a non-attorney witness to the conversation between Ms. Ruskin and Mr. Austin." (ECF No. 71-1, at 4–5.) The court does not credit this account for several reasons. Most importantly, the declaration is new evidence on a claim that was adjudicated on the merits in state court and is therefore not permissible evidence in this action. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that habeas review under § 2254(d)(1) of claims rejected on the merits in state court is limited to the state court record). Even aside from that prohibition, Ms. Harwell's assertion about what Mr. Austin said to Ms. Ruskin amounts to several layers of inadmissible hearsay. And finally, Ms. Harwell's recitation conflicts with the testimony of both Ms. Ruskin and Mr. Wendell, who were clearly in the better position to know what Mr. Austin told them and who was present for the conversation.

information was endorsed by the district attorney general or the Davidson County Grand Jury.

*Sentorya L. Young*, slip op. at 15. The coram nobis court also opined that the "chart" could not have brought to the jury's attention "evidence not otherwise presented to them." *Id.*, slip op. at 15–16.

The post-conviction court also concluded that, based upon the opinion of the court of criminal appeals, the coram nobis issue was "meritless." Indeed, the court of criminal appeals on direct appeal held that the petitioner, as the appellant on direct appeal, "failed to establish that the subsequently or newly discovered evidence might have resulted in a different judgment had it been presented at the trial" and that it agreed "with the rationale provided by the trial court in its extensive and thorough order." *See id.*, slip op. at 16.

The issue of trial counsels' failure to impeach the testimony of Chris Austin as ineffective assistance of counsel was not previously determined by the trial or appellate courts, but those courts did determine that the petitioner, in his coram nobis proceeding, failed to establish that the jury's exposure to the "chart" may have resulted in a judgment different from what would have resulted had it been kept from the jury's view. Because the withholding of the chart from the jury could not have resulted in a different verdict, coram nobis relief was not availed to the petitioner, see T.C.A. § 40–26–105, and because coram nobis relief would not have been granted, the petitioner in his post-conviction proceeding has failed to establish that he was prejudiced by any deficient performance by counsel in handling the coram nobis proceeding.

*Id.* at *6.

As *Strickland* expressly authorizes, the state court found it most efficient to dispose of the petitioner's ineffective-assistance claim by finding lack of prejudice without evaluating counsel's performance. The court concluded that because (as it had already decided on direct appeal) the petitioner would not have been prejudiced by the presence of the document in the jury room, any deficiency in counsel's performance with regard to establishing **whether** the document was in the jury room was inconsequential. The petitioner disagrees with the underlying conclusion about the non-prejudicial nature of the document, but this court has already found that determination to be reasonable in connection with Claim 3 above.

Alternatively, even if this court had found the state court's decision on the prejudice prong of *Strickland* to be unreasonable, *de novo* review of the facts in the record would cause it to find that counsel's performance at the coram nobis hearing was not deficient. *See Rayner v.*

*Mills*, 685 F.3d 631, 636–39 (6th Cir. 2012) (where state court relies on only one prong, the habeas court may review the other prong *de novo*).  On cross-examination, counsel did, in fact, question Mr. Austin about his prior statement to Ms. Ruskin and his memory of the trial, and led him to acknowledge repeatedly that he did not specifically remember the handling of the document in question. (ECF No. 34-20, at 59–63.)  It was clear from his testimony that he was certain that the document did not wind up in the jury room because of his strict compliance with procedure, rather than because he specifically recalled that particular document:

> Q:     What I was trying to get at is, when you collected these exhibits into your arms, I have a mental picture in my head of that moment after the jury was out when my adrenaline was coming down, but when you collected those exhibits in your arms, you can testify from procedure where you would have gotten them, but you don't have an actual memory of whether you got them from the easel and took them to Aaron or whether –
>
> A:     Every exhibit that went in the jury room would have been handed to me at Aaron Gray's desk, I would not have got the handful and stopped by an easel and tore some pages off and stuck them in my arm and walked down the hallway.  Every exhibit that I retrieved would've been from Mr. Gray.
>
> Q:     And you are testifying that it would have been that way why?
>
> A:     Because that's the way we do it every time.  I'm not going to take a risk of something like this happening.
>
> Q:     Okay.  And so, just to further clarify, you're saying that it would have been that way because that's the way we do it every time?
>
> A:     That's the way we operate.
>
> Q:     And you're testifying that you're sure of it because that's the way you do it every time, not because you have a memory of it?
>
> A:     I can sit here and honestly say that we do it that way every time.  I mean, I'm straight by the book when it comes to this courtroom.

(ECF No. 34-20, at 64–65.)  This testimony was consistent with Mr. Austin's alleged prior statement, and counsel's strategic decision not to elaborate further or be more overtly confrontational in making her point did not fall below the range of competent assistance.

Claim 13 is without merit and will be dismissed.

### 6.  Claim 14 – Failure of Trial Court to Act as Thirteenth Juror

The petitioner claims that the trial judge erred by abdicating his duty under then-Tennessee Rule of Criminal Procedure 33(f) to act as thirteenth juror and independently weigh the evidence in ruling on the petitioner's motion for new trial.  The petitioner exhausted this claim on direct appeal to the Tennessee Court of Criminal Appeals, which found based on applicable state law that the petitioner was not entitled to relief. *State v. Young*, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *7–9 (Tenn. Ct. Crim. App. May 12, 2008).

This claim arises under and is controlled by state law.  State courts' interpretation of state law binds the federal court in habeas corpus cases. *Estelle v. McGuire*. 502 U.S. 62, 67–68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions.").  The petitioner contends that a state court's misapplication of purely state law implicates federal due process rights. (ECF No. 30, at 78.)  Even accepting that assumption for the sake of argument, the court finds that the petitioner has not cited any federal law clearly establishing that his rights were violated in connection with his Thirteenth Juror claim.  This claim will be dismissed.

### 7.  Claim 17 – Ineffective Assistance of Counsel During Voir Dire

The petitioner claims that trial counsel Amy Harwell was ineffective for not moving to strike the entire panel of potential jurors who heard one prospective juror on voir dire discuss a gruesome crime of which he and his mother had been victims when he was a child.  Ms. Harwell testified at the post-conviction hearing that she "recall[ed] very distinctly" the prospective juror's comments:

> As I recall, he related that when he was a very small child, I want to say he was two, he and his mother were kidnapped, taken out to the forest where she was raped repeatedly and ultimately killed.  He related that the people who did that to his mother were on death row in Texas.  And that he . . . he went ahead and volunteered that he thought that, you know, anyone who killed anyone should be put on death row and was pretty adamant about his thoughts.

(ECF No. 34-27, at 82–83.)  Asked about the impact on the other jurors, she said

It had an impact on me. His recitation was fairly emotional, and, I mean, he related such a gripping, horrible story, kind of in a – it was in a very matter-of-fact way, but I mean he was clearly very angry, as he's entitled to be, I don't mean any judgment by that, but it was very emotional for me to hear it, so I assumed that the jurors were emotionally hearing it. He was not the only person who – we had several stories of people being victims of crime. There was another man who related that his son had been shot eleven times. There were several of these stories that came out.

(ECF No. 34-27, at 83–84.) On cross-examination, Ms. Harwell acknowledged that rape and being tied up in the woods had nothing to do with the crimes for which the petitioner was on trial, but said "[n]ot those parts, the killing part was somewhat related to our murder trial." (ECF No. 34-27, at 94–95.)

However, impactful Ms. Harwell felt the juror's comments to be, her recollection of the details was not as "distinct" as she believed. According to the voir dire transcript, the juror and his mother were in fact abducted, and she was raped, but she was not killed, and the perpetrators were not on death row. (ECF No. 73-2, at 38.) He did add that he wished the perpetrators had been sentenced to death because of his mother's years of struggling with depression and repeatedly having to object to parole for the perpetrators, and that – apparently unrelatedly – he had lost two close friends to murder. (ECF No. 73-2, at 39.) On further questioning by the trial judge, the juror acknowledged that the petitioner was presumed innocent, and that there are circumstances that would justify one person's taking the life of another person. (ECF No. 73-2, at 40–41.) Nevertheless, he admitted that he probably could not be fair and impartial as a juror, and the court excused him for cause on Ms. Harwell's motion. (ECF No. 73-2, at 42–43.)

Apparently without the benefit of the voir dire transcript, the post-conviction court adopted the petitioner's inaccurate account of the dismissed juror's comments, but still denied relief:

Petitioner has failed to show how counsel was ineffective in failing to challenge the venire because of one juror relating the chilling events of his mother's rape and murder or how that prejudiced that juror or any other juror to sit on the trial of

48

his case. Admittedly, the events related by the prospective juror were disturbing and his assertions that persons convicted of such crimes should be put to death were emphatic, the prospective juror never intimated that he thought the Petitioner was guilty of the crimes with which he was charged. Moreover, there was no indication the remaining jurors were swayed in their ability to be fair and impartial as a result of hearing this one juror's account of a life experience and the impact it had on him. This issue is without merit.

(ECF No. 34-27, at 62.) The state appellate court affirmed in abbreviated fashion by quoting a few lines of the lower court's opinion and stating:

We agree. Upon the record, we discern no showing of prejudice as a premise for ineffective assistance of counsel based upon counsel's failure . . . to object to the empaneling of jurors who heard comments from prospective jurors.

*Young v. State*, No. M2010-01762-CCA-R3PC, 2011 WL 3630128, at *6 (Tenn. Ct. Crim. App. Aug. 18, 2011). Thus, after reciting the *Strickland* standard, the state court once again found it unnecessary to look beyond the prejudice prong to dispose of this claim.

The petitioner's only argument against the reasonableness of the state court's determination is the conclusory statement that the dismissed juror's comments were "obviously prejudicial." (ECF No. 71, at 50–51.) The petitioner had the opportunity in state court to present juror testimony on this point, just as he did in connection with Claim 3, but chose not to do so. He does not cite any facts in the record establishing prejudicial impact on the jury, and does not cite any clearly established federal law creating a presumption of such prejudice.

The petitioner has failed to demonstrate that he is entitled to relief under § 2254(d), and this claim will be dismissed.

## VII.    CONCLUSION

For the reasons set forth above, all of the petitioner's claims are either procedurally defaulted or fail on the merits. Accordingly, the court will deny the requested relief and dismiss

the petition.

An appropriate order shall enter.

Aleta A. Trauger
United States District Judge